v. Kay and Kay Contracting & Builders. Court order is not to exceed 15 minutes per side. 15 minutes ought to be shared by the appellees. Mr. Steinmetz for the appellant. Good morning. May it please the court and counsel, I am Robert Steinmetz. I'm here for Liberty Mutual Fire Insurance Company. I'd like to reserve three minutes for rebuttal, please. Liberty Mutual appealed this case for two reasons. One, for this court to determine as a matter of law under the facts of this case whether the faulty workmanship alleged against Kay that caused cracks in a Walmart store constitute an occurrence under Kay's CGL policy that it had with Liberty. Both coverage for Kay and coverage for M.W. which are two separate things. Secondly, we appealed because if you do find that there's a possibility of an occurrence, there were issues that remained to be litigated under the agreement of the parties as acknowledged by the court and we didn't get to those issues. And if you find that there's an occurrence, we'd like a remand so that we can get to exclusions and the issue of whether there was property damage and to what extent. You don't expect us to find it to be an occurrence, though? We do not. Our primary argument is that this was not an occurrence and that therefore the exclusion issue becomes mitigated. Yes. In this action, like any other coverage action, it's important first off to define what the claim is. And it's easy in a case like this to lose sight of what the claim is. The claim here is one that Walmart pursued for breach of contract. Walmart told M.W. that M.W. had breached the agreement because the site pad was not done correctly. That caused what you would expect to happen when the site prep wasn't done correctly, which is some cracking in the Walmart store. M.W. then in turn went to Kay and said you breached the subcontract and you need to cure. Let me ask, what if there had been damage inside the Walmart store? So this was in the, I don't know what it means to be the liquor bin or the liquor section. What if every expensive bottle of wine fell off the shelf? Would there be coverage under the CGL policy for that? Whether there's coverage for the personal property that falls off the shelf is kind of a different question. That's not what happened in this case. What did happen was there was a- I understand it's a different question. That's why I'm asking. I'm trying to understand the scope of your argument and how far it goes. Let me get, I guess, straight to the bottom line on that. Here's where we suggest you draw the line. If the duty that's been breached is one that's been created by contract, like it was here, Kay was supposed to do a site prep in order to prevent cracking and things like that in the Walmart store from settlement. If that duty that was breached was one that is one created by contract, that's faulty workmanship, it's not an accident. But if there's a tort duty that's been breached and causes damage, then that can be an accident. And that's where it makes logical sense to draw the line. So if the liquor that falls off the store shelves, if that's deemed to be a breach of a duty that's been created at common law in tort, that might have coverage. But in this particular situation, what actually happened was there were some cracks in the Walmart store. But don't they both stem from negligence? I mean, does that blur it a little? This distinction that you'd like us to draw contract and tort? Well, you have to draw the line at some point, and you have to decide whether you're going to call it negligence or whether you're going to call it faulty workmanship. It may seem like similar activities, but my point here is that the duty to Walmart and the duty to MW were not created by common law. Those duties were created by the contract. And so I would not classify that as negligence. It might not have been good performance under the contract, which in a tort context you might call the breach of a duty. So you have to go back to the origin of the duty to decide. There was some debate in the briefs over this. Is your contract argument one that goes to the contract exclusion in the policy, or is it one that you believe underlies the whole occurrence analysis, or both? It's the latter. We did not in any way argue any exclusion. In fact, there's not a breach of contract exclusion in the policy. There's an exclusion for duties assumed under a contract, which is different. We didn't cite that provision. We didn't argue that provision. What we said is in the KFB versus Blevins case, the Court of Appeals of Kentucky pretty clearly said that a breach of a contractually imposed duty is not covered.  Which is what eventually Judge Russell came to rule in the Global Gear case that both sides have cited here and argued. He ultimately said breach of contract is a reasonably foreseeable result, not an occurrence. So when we were making that argument to the trial court, and we're making that argument to Novo here, this case is a breach of contract case. And Blevins says that's not an occurrence. Is it your position that Judge Russell's whole discussion of occurrence is essentially addictive because he finds that there were exclusions that applied in any event? Yes. Okay. I mean, he could have started there. He could have said, let's look at the nature of the claim, which is what I'm suggesting makes sense. And when you read the Supreme Court opinion in Cincinnati Insurance versus Motorist, the court is saying that faulty workmanship is not an occurrence. And then we have this footnote at the very end that we have to deal with that said there may be a general rule that in some circumstances provides otherwise. I would suggest to the court that was Justice Minton trying to tell people, hey, if there's a tort duty, if there might be some circumstance under which that faulty workmanship might constitute an occurrence, but it's not in this kind of case. It would be in the kind of case where, let's say, there are cracks in the parking lot at Walmart and there's a motorist out on the parking lot, hits the crack, causes damage to the vehicle and bodily injury. That would be a common law of tort duty that Kay may have had to that motorist to prevent that kind of injury. What portion of all this damage, it's confusing between what was argued to the district court and what was argued to us as what the money has been spent on. But what portion of the damages or the monies actually went to repairing cracks or repairing damage to the facility as opposed to doing the work correctly in the first instance? Putting aside the argument that they didn't have the obligation to do it that way. Right. And that's the interesting thing here. Damages were never before the district court. All we've litigated, all we've dealt with is whether there's an occurrence, not if so, what's covered and to what extent. What happened here was you had cracking and some separation. Wal-Mart said you need to do these things in order to prevent that from happening again. So this prevented measures that were taken. To do that, what they did was they tore down the liquor box. The liquor box is what had the cracking. They didn't fix the crack. In a normal tort situation, the measure of damage would be the difference between the fair market value before and after. In the contract situation here, what they're saying is cure your performance. So they tore down the liquor box, they tore down the cracks, redid the site preparation, and then put the liquor box back. So the only way they fixed the cracks was by removing the whole store and putting it back. If you wanted to just repair the property damage, then you just fix the cracks. Part of what we never really got into damage is in the district court. But if and when we do, Liberty's position throughout has been what Wal-Mart demanded was not compensation for property damage, which is what a liability policy might provide for. Wal-Mart wanted to prevent future damage, and that's what the work was done for. And if you look at the damages aspect of this, most of what's being claimed, if you dig down into the documents, would be consequential damages that you might expect out of a breach of contract. Attorney's fees, consultant fees, things like that. There's not any discussion at all about the measure of damage in tort, which is what a CGL policy is intended to provide for. Do you think that your complaint, your D.J. complaint, was broad enough to request that the district court separate out the measure of damages? Yes and no. And the reason I say it that way is we were going to the coverage issues about whether there was coverage, and our position was there's not an occurrence. If there is an occurrence, there are exclusions that apply. And we didn't raise the issue of damage, and I don't recall the issue of damages being raised in the counterclaims for coverage. This was entirely a coverage issue, and we didn't get into if so what so. More importantly, the court should keep in mind that the issue of whether Kay's faulty workmanship caused this problem is not before this court. It's before another court. When this case was decided, Walmart never sued Kay before we brought the coverage issue up. And when this issue was decided, there was no litigation concerning that issue. And this is a declaratory judgment action? Correct. So essentially, you came into federal court just to have the coverage issue determined and, in your view, disposed of so that there wouldn't be any further litigation? Correct. We are now providing a defense to Kay under a reservation of rights in the action that Kay brought in order to enforce a mechanics lien in state court, knowing that that would draw counterclaims, saying we don't owe you the money because you caused the problem. But we tried to cut that off the pass with this action. One last question. What does it mean for M&W to be an additional insured under this policy? Does it step in the shoes of Kay, or does it have an independent right under the policy? I've found no authority that indicates that M&W steps in the shoes of Kay. In fact, what M&W is seeking is first-party coverage. If it's an additional insured, it's an insured. Now, you do have to look at the endorsement to find out to what extent. But M&W never argued that before the district court, and M&W has not discussed in any way the terms of the additional insured endorsement in this court. All it said is that it exists. Then M&W wants to take the next not necessarily logical step that says we step in the shoes of Kay without citing any authority. And when we researched it, we couldn't find authority that supports that. Instead, we've cited a case that suggests that, no, once you get the status of an insured, livery has to treat you as a first-party insured, not as someone that's coattailing on Kay. Thank you. Thank you. Good morning. My name is Nathan Billings. I represent K&K Contracting as appellee, and I've been designated as 10 minutes for defendants, appellees. May I answer your last question? Do you represent the additional insured? I do not. Mr. Woodall. Oh, okay. So may it please the Court, Mr. Steinmetz and Mr. Woodall, let me try to address the Court's last question to Mr. Steinmetz. Essentially, was the district court complaint broad enough to address damages? And that is a two-part answer. The complaint itself was not. It was for declaratory judgment on behalf of Liberty Mutual. The counterclaim back was, in fact, for declaratory judgment, as well as damages resulting from their failure to provide coverage when the claim was made, essentially seeking not just indemnity and a defense under the death action, but also damages that resulted to decay from their failure to pick up coverage from the beginning, such as attorney's fees, et cetera. The question of damages. Et cetera. What's the et cetera? Punitive damages, attorney's fees, things we never ended up litigating. I mean, it's all fees. That's correct. Cost. The question of the cost to repair. Wait. So you would agree, then, that the trial court acted presumptively or precipitously and that he should not have dismissed all these? Not at all, Your Honor. My belief is that once the court entered the two-part ruling, which it did, which one, it found there was an occurrence, which it did properly, and two, that Liberty Mutual opened the door to the exclusions in its briefs, heard oral arguments on that, rejected those arguments, heard a motion to partially alter amend or vacate, again rejected those arguments, that sort of like let sleeping dogs lie, we were fine with the coverage opinion and at that point in time to not move forward with the other claim. Did you voluntarily dismiss your counterclaim? No. I'd say it's ambiguous as to what's going on. The district court did not. It sounds to me like there might not even be a final judgment. That has been a question that has crossed my mind, Your Honor. We have taken no steps at all to pursue that in the district court because it is our belief that once the district court found that, to Liberty Mutual's credit, they immediately or soon thereafter provided coverage to Kay in what is now a separate pending action. And therefore, the amount of damages were of such an amount that at that point in time, it just didn't make economic sense to continue to try to litigate. That once the coverage issue was decided. But now you're telling us that, but the docket doesn't reflect that everybody said no harm, no foul. Well, the court dismissed the complaint. It issued a final judgment. The language did not reflect either of our counterclaims, but it dismissed the case in full on the deck action issue. When it found the occurrence and it found coverage was owed, it's our belief that at that point in time, we were satisfied with the district court's ruling on that. Well, I'm struggling a little bit with your claim that Liberty Mutual in fact opened the door and argued the exclusions. The parties at the Rule 26 meeting agreed to address the occurrence issue as a preliminary matter in the case. And did they not agree to address only the occurrence issue? That is correct. And I think the word only was actually in either the report or the order. That's what I thought. Okay. However, in the actual briefs on the case, Liberty Mutual sought summary judgment on that. And it's addressed the policy exclusions in its memorandum of support, which is the district court record 35-1, the appellate record page 720, 721 to 723. I open that up. K and M&W then responded to those in their briefs. Specifically with respect to K, it was on page 53. Well, they didn't outline all the exclusions. What they argued is what exactly Mr. Steinmetz argued here, which is that the question of whether it's really a contract duty versus a tort duty underlies the occurrence question. You can't separate those things. Well, that's possible. But the distinction is what he wanted to do is to argue the exclusions is why the court shouldn't find the occurrence. And the analysis from the cases that have addressed the Cincinnati clearly draw a distinction, says you can do one step and then the other. But what Liberty Mutual's brief did is try to open the door to hold that there was no occurrence. But the court didn't so hold. You mean the other courts? Well, no, I'm talking about this court. No, this court is not. This trial court did not so hold. The district court addressed this in two places. It addressed it at both the hearing and it also addressed it in its order denying Liberty Mutual's motion to partially alter amend or vacate. Specifically, those references are page. But I understand what you're telling me, counsel, but the judgment from the court said it's an occurrence, bye. Right? Well, that's correct. That's what the court said. What we also think is that the fact that we cited a case, the Ledford versus, I may have mispronounced this, the Tiege case, Henry Sam's, talks about the federal courts recognize that summary judgment can be issued when there's no dispute of the fact. They can issue it even to a sponte. We don't think it was just to a sponte because the parties briefed the issue, despite the prior agreement to. They argued the issue. Well, actually, I do have your exact quote from the transcript where you talked about this. In their briefing, you felt that they went beyond the issues, and you said, we're not going to argue that. We're not here for that. You said, the question before the court today is simply this. Is what M&W and Walmart alleged against K&K, does it constitute an occurrence under the policy? And you went out of your way to say to the district court, we're not arguing. In absolute candor, because that's what the order said. And if you read the rest of the transcript, we then spend three to five minutes after that discussing the very issue that I said we shouldn't discuss. The district court, Judge Wilhoyd, wanted to discuss it. It was briefed by the parties. You say it was briefed by the parties. I'm really struggling with finding where it was briefed by the parties. Give me your page IDs again. Liberty Mutual raised it in the district court record, record 35-1, pages 4, 5, and 7, which is the record on appeal. Page ID 720, 721, and 723. We addressed it in our response and reply to summary judgment, which is the district court record 40, pages 2 and 4, and the record on appeal here, page 770. Those are briefs? Those are the references to our memorandums in support of summary judgment. I understand. Okay. Maybe I'm using the word brief too broadly. It was addressed in the argument sections of the motions. Coming back to the first issue, I think there's three issues before the court. There's the issue of the occurrence, there's the issue of did the district court properly grant summary judgment regarding exclusions, and the third one is the motion to certify back to the Supreme Court that we have filed. Coming back to the first issue, this court issued an opinion in January of this year by different panels, an unpublished decision called McBride v. Acuity. You spend a lot of time on McBride, and you spend a lot of time discussing the subcontractor exception, but how is this even a subcontractor exception case? We're talking about the activities of the subcontractor in connection with the subcontractor's own CGL policy. Well, the term subcontractor exception was the phrase that this court used in the McBride opinion that had not been used in any of the about 10, either Kentucky or U.S. In that case, the policy had been issued to the general contractor. That's right, but here is what that case says, which is critical, we think, to this court's resolution of our issue today, as concerns coverage to K&K. It said that, or it construed Cincinnati to strongly suggest that Kentucky courts would permit coverage, and this is the quote, when someone else's property rather than the insurer's non-faulty workmanship is damaged by the work of the subcontractor, end quote. That case dealt with a contractor who had the entire scope of work, allegedly had defective work that damaged other things. That case did not involve a subcontractor, like we are, whose allegedly defective work, and again, we're not conceiving whether their work was defective, but that our allegedly defective work damaged other people's work on the project. And if you read the court's language... Well, the court's language didn't say, first of all, it didn't say other people's work on the project. It said other people's property. That's correct. Meaning outside the scope of the project. Well, that could be. The court didn't say that, though. Well, the court did say that the general contractor's policy wouldn't cover anything that had to do with the project because the general contractor was in charge of the project as a whole. I would respectfully say that the nuance of that case said that the general contractor's policy does not cover claims for defective work that was the scope of the general contractor, not for the subcontractor. And the reason I would say that is... But the holding in McBride was that the general contractor, as it was in Cincinnati, was that the scope of the general contractor's work included everything. That's correct. For the general, but not for the sub. And this is what's happened in all of these cases. Cincinnati had a very, very clear phrase that said defective workmanship, standing alone. Almost all of the cases have dropped or ignored that standing alone. Standing alone goes in reference, footnote 45 of Cincinnati, which is what this case is about. And that footnote acknowledges that the general rule exists where the policy applies if faulty workmanship... And, of course, you all have read this. It says it causes bodily injury or property damage to something other than the insured's allegedly faulty work product. And so when you read McBride, it's acknowledging that reference. But it doesn't concern the subcontractor's work that damages a third party's work on the project, which is what footnote 45 does. How much of the $3-plus million was spent redoing the site work and pad? And how much of it was spent repairing cracks? We don't have an exact breakout of figures of approximately $3 million. We think it's about $1 or $1.1 million that was used to drive micropiles into the ground that lifted up the foundation and footers, and about $2 million to deconstruct the cracked building, the cracked structure, take down electrical wiring, plumbing, haul off the debris. Seems like you argued the opposite in front of the district court. You said it was about $3 million to put the footers in and repair the site. I thought we said $3 million for the entire project. There's not been a factual finding on that. What the cost of the pilings to do, which is the things that were driven down into the ground underneath the structure, that was the approximate cost of that. The rest of the cost with respect to repairing the structure itself. And I see that my time is up. Thank you, Counsel. Thank you very much for your time today. Your Honor, may it please the Court, Mr. Steinmetz and Mr. Billings, my name is John Woodall. I represent MW Builders. MW Builders is a preferred, or was a preferred, general contractor for Walmart. We were named... No more? Well, I think we still are, but this has strained the relationship a little bit. But in any event, quickly, this issue about whether we are or are not an additional insured, all I know is we were named in this litigation for some reason. We have no direct contractual relationship with Liberty other than through the additional insured relationship. This is just a factual query on my part, because I don't get it. The endorsement doesn't mention M&W. Is the company listed on the endorsement the same as M&W? Our contract with K&K required that we be an additional insured. Their insurance policy has an endorsement that states any party such as MW, with which they have a contract, where it's a requirement that that party become an additional insured, must then... is an additional insured. And that's what we've pled in our briefs. And in candor with the court, that's not an issue that the lower court devoted a whole lot of time to, nor did we, because frankly, we didn't see any way that Liberty could dispute our additional insured status in good faith. And also, we're not... I mean, in a position of an additional insured, we're not entitled to any more or any less, in my mind, than is K&K. And in terms of the damages, there's some confusion on that. The $3 million figure, the reason why, I think you probably saw 2.5 or so in MW's brief and over $3 million in ours, that's probably because ours, through, you know, in discovery and through the mediation phase and trying to get this case settled, Walmart's claim of a little over half a million dollars is also thrown into that number. And that includes their engineering and things of that nature. So that's why it's a little bit higher. But just to cut to the heart of this, from MW's perspective and my perspective in this litigation, to be absolutely candid with this panel, if the court does not accept the distinction that we have drawn in this case between a subcontractor and a general contractor and the fact that the analysis here has to begin at the subcontractor level and because of that, that distinguishes this case from Cincinnati Insurance, well then, there's no way that we can win. That all assumes the court's agreement with the district court with respect to whether this was an occurrence. Yes. This is secondary to that. When Cincinnati Insurance came out, I have the privilege of representing a whole lot of contractors, both residential and commercial. There was a whole lot of consternation in the industry. What are we going to do? Because we've always kind of understood that damage that we cause to our own work is not going to be covered by a CGL policy. But if our work causes damage to another portion of the building or whatnot, that would be covered. Well, here comes the Kentucky Supreme Court and says, well, wait a minute, general contractor. This whole project is yours. And so therefore, there is no coverage under your CGL policy for faulty workmanship. And whether there's damage for faulty workmanship that causes damage to something else, well, we're going to save that for another day. So that left us in a position of, how do we close the gate on this from a general contractor perspective? And the only thing that we can do is make sure that our subcontractors all have their own CGL policy. So when we get into this situation where the damage occurs at the subcontractor level, we can make the argument that we've made in this case. But the performance bond is supposed to cover their failure to actually perform, correct? Well... I mean, even if we accept your argument that collateral damage and your briefs, you know, the argument you made at the district court is very different than the argument that's being made here because the district court, you were saying, everything was covered. Here, you're saying you're not asking to have the repair of the site covered. Your Honor, with all due respect, we didn't get into the damages aspect at the district court level. Well, in the transcript you did. You went into a lot of detail, or at least Mr. Billings did. Okay. At the district court level, I believe, from MW Builder's perspective, I mean, same as we're here today, we're an additional insured. And as far as I'm concerned, if at some point there's a damages determination here, what is covered is going to be the same for both of us. But the performance bond is supposed to cover a lack of performance, correct? Well, it can. But here's the problem, and I know that the Kentucky Supreme Court looked at that in the residential... from the residential standpoint, it's not workable. The other problem it creates for K&K is performance bonds come with indemnity agreements, with personal guarantees. That's why K&K jumped in here and did the right thing and stepped up and performed this remediation. Because if their bonding company had done it, then as I said at the district court level, the owners of K&K would have gotten a tap on the shoulder. Yeah, but I mean, Liberty shouldn't have to pay up on a performance bond just because the owners of K&K signed an indemnity agreement. I agree, but as far as I'm concerned, Your Honor, Liberty, just like every other insurance company that's fighting this battle across the country, sold a policy. The expectation of that policy was coverage for damages caused by faulty workmanship to other property. And in this particular case, that's what we have. That's the way the case has been pled. That's the way the case has been argued. Like I said, if this panel does not want to recognize the distinction between work done at the general contractor level and at the subcontractor level, there's nothing we can do about that. That's where we are. Thank you, counsel. Thank you. There's a lot that I could talk about, but let me try to hit two or three real quick points. Why isn't this other property? Maybe start there, counsel. I mean, counsel closed with two other property. I'm wondering what you say about that. When the court in McBride talked about other property, it talked about another's property. Okay, that's the way you would understand that phrase.  And it's not talking about... But that was another vis-a-vis the general contractor. That is correct. And the argument here is that another's property vis-a-vis the subcontractor is the general contractor. And I would submit to the court, that doesn't really make total sense. When you talk about another's property, that should be someone else's property and not the building that's under construction. But what do they pay premiums for? Pardon me? What do they pay premiums for? If they commit torts. That's what general liability policies are for. They're not for breach of contract. And you talked about a performance bond. The focus, if you follow the... If there's an auto accident on the site, is that the kind of thing that answers... If there's an auto accident on the site... Judge O'Malley's question? If there's somebody that's walking in the parking lot or inside the store and they trip on a crack, that might be covered. The Kentucky Supreme Court focuses on, if you follow Kentucky, recovery for tort claimants. They don't necessarily focus on recovery for people that have contracts breached on them. Kentucky tries to find a remedy for people that are tort claimants. They don't really care whether Kay has indemnified someone under a performance bond. And I say don't care. That's probably strong. That's not the remedies that our Supreme Court has tried to fashion, which suggests that in this kind of case, if there is a breach of contract, that's not what a general liability policy is supposed to cover. There's a case out of North Dakota that was decided after all the briefing was done. It's K&L Homes versus American Family Insurance Company, 829 Northwest 2nd, 724. It was decided in April. And that's a case where North Dakota had the same kind of concept that Judge Russell followed in the Global Gear case in his, what I would call, dictum, there was a Burns-Smith case where the court drew the distinction between faulty workmanship that damages the insured's work and faulty workmanship that damages someone else's work on the same project. And the Supreme Court revisited that and said, you know, that distinction doesn't make sense. And said the focus on the nature of the property damaged to define whether there has been an occurrence has been criticized by the courts and the commentators. The reason that it's been criticized is to get to that point, if you dig down into the cases, the courts had to look at exceptions, the your work exception, in order to decide whether there's coverage under the insuring agreement. And the Arkansas Supreme Court has said, we're not going to do that. That's not how you construe contracts. So the North Dakota Supreme Court said, it doesn't make sense to draw the line there, which is why when you talk about property, it's another's property. It's not the property that's being constructed. What happened here was the foreseeable natural consequence of failing to do the site prep work the way you're supposed to do it. The only reason that Kay was hired is to prevent what happened. So that's a breach of contract. Thank you, counsel. Thank you. Case will be submitted. Clerk, recall the next case.